UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: DREDGING LIMITATION ACTIONS         CIVIL ACTION
CONSOLIDATED LITIGATION
                                           NO. 06-8676

PERTAINS TO:                               SECTION "K"(2)
ALL DREDGING LIMITATION ACTIONS


**ORDER AND REASONS**

Before the Court is The Limitation Dredgers' Motion to Dismiss Pursuant to 12(b)(1) and 12(c) (Doc. 128) filed by Great Lakes Dredge & Dock Company L.L.C., Mike Hooks, Inc., T.L. James & Company, Inc. TLJIC, L.L.C., Manson Construction Co., Luhr Bros. Inc., King Fisher Marine Service, L.P., Pine Bluff Sand & Gravel Company, Weeks Marine, Inc. and Gulf Coast Trailing Company[1] (collectively "the Limitation Dredgers").  Hurricane Katrina flood victims filed in *In re Katrina Canal Breaches Consolidated Litigation*, C.A. No. 05-4182, two separate suits seeking damages for flooding based on these parties' MRGO dredging activities.  These suits, *Reed*, No. 06-2152 and *Ackerson,* No. 06-4066, were dismissed.  *See In re Katrina Canal Breaches Consolidated Litigation (Pertaining to Reed and Ackerson)*, 2007 WL 763742 (E.D.La. March 9, 2007).  However, prior to the dismissal, the dredgers filed a number of petitions for exoneration or limitation which have been consolidated in the instant case.  As such, plaintiffs in *Reed* and *Ackerman* have been given the opportunity to assert their claims again.

In this motion, based, *inter alia,* on the Court's rulings in *Reed/Ackerman,* Limitation Dredgers seek the dismissal of forty-seven claims and/or answers, as well as several thousand

---

[1] Gulf Coast Trailing Company was inadvertently omitted from the initial motion, moved to join in said motion, which motion was granted.  (See doc. 178).

claims filed on behalf of tens of thousands of individuals, businesses, and other entities allegedly harmed by Hurricane Katrina (collectively "Claimants"). (See Exhibit 1 of Doc. 128-2, Memorandum of Law in Support of the Limitation Dredgers' Motion to Dismiss Pursuant to 12(b)(1) and 12(c)). Claimants contend that the Limitation Dredgers are liable:

> for all damages suffered by Claimants after Hurricane Katrina made landfall on August 29, 2005, when several levee systems failed as a result of environmental damage to protective wetlands caused by the Limitation Petitioners' maritime activities in the Mississippi River Gulf Outlet ("MRGO") from 1958 through August 29, 2005.

(Doc. 19, Claims of the State of Louisiana, Orleans Parish School Board, Debbie M. Thomas Richardson, Phillip Reed, and all the other claimants identified in the Lists of Claimants Nos. 1 through 6).[2] Based on maritime law, claimants maintain that under *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979), that if these dredgers were even one percent liable, they would be liable for the entirety of the damages. (Doc. 192, Transcript of Hearing on Motion at 32). While certain new allegations which were not contained in the *Reed/Ackerman* case have been raised, the Court finds that Limitation Dredgers' motion is well-taken and the subject motion will be granted.

---

[2]Because of the sheer magnitude of claimants and numerous individual limitation of liability of suits filed, the parties agreed to allow the attaching of Lists of Claimants to pleadings and that any answer filed by any claimant inures to the benefit of all claimants. For purposes of the analysis herein, the Court will use Doc. 19 "Claims" and Doc. 10, "Answer to Complaint for Exoneration From or Limitation of Liability" filed by the State of Louisiana, Orleans Parish School Board, Debbie M. Thomas Richardson, Phillip Reed, and all the other claimants identified in any and all claims filed in the *In Re: Katrina Dredging Limitation Actions Consolidated Litigation.* The previously noted Exhibit 1 to Doc. 128-2 succinctly sets forth the differences in the individual filings; however, at oral argument it became clear that both sides approved of this global approach.

**Background--Claims Filed in these Limitations**

MRGO is a navigational channel that runs from the Gulf of Mexico alongside St. Bernard Parish and into the Industrial Canal in New Orleans. Congress authorized it in 1956 as a 76-mile deep draft navigation channel connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC"). The Corps designed, constructed, operated, and maintained the MRGO. However, since its completion in 1968, the top width of the channel increased from 650 feet to an average of 1,500 feet, in 1987, principally due to erosion. It is contended that now the width is over 2,000 feet. As noted, iIn *Reed* and *Ackerson*, the instant Claimants in these consolidated limitation cases were plaintiffs in class action complaints seeking damages for the catastrophic flooding of St. Bernard and Orleans Parishes which they contended was caused in part by the dredging done by dredgers pursuant to contracts with the Army Corps to maintain the navigability of MRGO. Claimants contended that the construction and maintenance of MRGO resulted in: (1) the creation of a funnel that exacerbated the storm surge along the Industrial Canal and (2) the devastation of the wetlands that had acted as a natural buffer for storm surge. With the disappearance of those wetlands, the surge was exponentially greater, which increased pressure on the levee system causing it to fail cataclysmically.

This Court dismissed the *Reed/Ackerman* complaints as well as denying leave to amend to add a litany of alleged violations of various statutes finding the amendment futile. Relying on *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 13 (1940), this Court found that the contractor defense shielded the dredging defendants therein. In particular, noting that in the complaints plaintiffs alleged that the dredging defendants dredged pursuant to specific Government

3

contracts; that the Government approved reasonably precise specifications with which the dredging defendants conformed; and that the Government knew of the potential harmful effects of the MRGO, the Court found that the dredging defendants there could not be held liable for performing contracts in conformity with the Government's specifications, providing the contractors carried out such contracts with due care and absent negligence. *In re Katrina Canal Breaches Consolidated Litigation (Pertaining to Reed and Ackerson)*, 2007 WL 763742 at *4 (E.D.La. March 9, 2007) *citing Hercules Inc. v. United States*, 516 U.S. 417, 421-22 (1996) and *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988). In response to plaintiffs' request for discovery to determine whether the dredging defendants committed any act of omission or commission which would place them beyond the *Yearsley* rubric, the Court found that such discovery would have constituted a rank fishing expedition.

In the instant limitation actions which were brought by the dredgers to seek exoneration or limitation of their alleged liability to the value of the dredging vessels, the door was opened for the *Reed/Ackerman* plaintiffs to rectify and re-invigorate these same claims. In doing so, they have filed practically identical allegations of wrong-doing. A close review of the "Claim" filed and the *Reed* complaint finds practically verbatim recitation of the same allegations. *Compare* Claim, Doc. 19, ¶¶ 1-16 to *Reed* Complaint, ¶¶ 7-22.

In addition to the necessary allegations to defeat the Limitation Dredgers' invocation of the shield of limitation (see ¶¶17-18), Claimants have now included specific allegations of negligence on the part of the Limitation Dredgers. At Paragraph 5 of the Claim (which is a mirror of ¶11 of the *Reed* complaint), with respect to the allegations concerning the destruction

of the wetlands caused by the excavation of the channel, the Claimants added that the erosion process was caused by the maintenance dredging conducted by the dredgers.

At Paragraph 21, Claimants specifically allege that "[t]he Corps of Engineers did not issue reasonably precise specification to Limitation petitioners and the Vessels, to follow while conducting their dredging work in the MRGO. " At Paragraph 22, they state, "If the Corps of Engineers issued reasonably precise specifications for the work conducted in the MRGO, then Limitation Petitioners and theVessels failed to follow them." Paragraphs 23 through 25 address actions that would defeat the government contractor defense and the discretionary function exception. At Paragraph 27 they allege that the vessels were unseaworthy because they were not the correct type needed, lacked proper equipment or lacked proper control. Paragraphs 28-30 raise the exact same statutes –both federal and state–which this Court rejected as applicable in its *Reed/ Ackerman* decision.

However, the most pointed, new allegations to overcome the dismissal of *Reed/Ackerman* based on the failure to allege negligence are contained at Paragraph 31 which states:

> Limitation Petitioners and the Vessels have performed "advance maintenance" and "over-depth" dredging of the MRGO, going beyond its authorized project depth. Limitation petitioners and the Vessels have also performed "over-width" dredging, also for advance maintenance purposes. Limitation Petitioners and the Vessels also overcut the slope of the channel, based on the potential for undisturbed material to slough downward to the channel, and for other reasons, changing the designed slope of the channel's banks, thereby enlarging the design width of the channel, causing wetlands along the banks of the channel to erode, causing the width of the channel to increase. These activities were conducted without authorization, approval or control of the Corps of Engineers, and were outside of any reasonably detailed specifications provided by the Corps of Engineers for the work. These activities by Limitation Petitioners and the Vessels constitute negligence and violate regulations enacted to control dredging activities.

With this background concerning prior allegations and rulings thereon, the Court will now turn to the instant motion.

**Limitation Dredgers' Motion to Dismiss**

The Limitation Dredgers contend that the Court dismissed identical claims in the *Reed* and *Ackerman* cases and that the claimants allegations are insufficient. Moreover, alternatively, they contend that claimant's injuries are not a foreseeable result of negligence, maintenance, and dredging, and that the hurricane damages are "beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers." *Consolidated Aluminum Corps. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987). Movers also contend that the allegations made by the Claimant are really aimed at the construction of MRGO, and the required maintenance of the MRGO was undertaken at the direction of the Corps of Engineers, not by the dredgers. While the Limitation Dredgers acknowledge that the Claimants have made new allegations, they maintain that the allegations are conclusory and legal conclusions masquerading as factual conclusions citing *Twombly Bell Atl. Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007):   "Rule 8(a)(2) still requires a showing rather than a blanket assertion of entitlement to relief."

With respect to the allegations of Paragraph 31 quoted above, Movers reurge that the dredgers were simply acting on behalf of the Corps and at the direction of the Corps and that the pleadings so demonstrate. Therefore, they contend that there is no need to make a showing of the government contract defense because it is, in essence, inherent in the pleadings

Moreover, the Limitation Dredgers also maintain Claimants have failed to make a sufficient showing under *Twombly* considering that 22 vessels operated by nine dredging companies over the course of thirteen years under dozens of contracts removed more than seventy-three million cubic yards of dredging material. As noted by Judge Vance in *Barasich v. Columbian Gulf Transmission Company*, 467 F. Supp.2d 676 (E.D. La. 2006):

> Plaintiffs do not allege that the actions of any particular defendant were a substantial factor in causing the injuries suffered by any particular plaintiff, nor do they assert a causal connection linking a particular defendant's operations to a particular plaintiff's injury.

*Id.* at 694. In essence, Limitation Dredgers allege that Claimants' attempt to pierce the dredger's immunity with conclusory allegations of collective negligence should be rejected.

Alternatively, the dredgers argue that Claimants' injuries were legally unforeseeable. A succinct and cogent definition of forseeability under maritime law is set forth in *Consolidated Aluminum Corp. v. C. F. Bean Corp.*, 833 F. 2d 65 (5th Cir. 1987) which states:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

*Id*. at 67. Thus, the Limitation Dredgers argue that they did not owe a duty to protect the plaintiffs from hurricane damages because such flood damages caused by Hurricane Katrina are not a foreseeable result of negligent dredging. *See also In re: Taira Lynn Marine, Ltd*., 5 LLC, 444 F. 3d 371 (5th Cir. 2006), *Lloyds Leasing, Ltd. v. Conoco*, 868 F.2d 1427 (5th Cir. 1989).

**Claimants' Position**

Claimants contend that unlike the complaints filed in *Reed /Ackerson*, the claims filed in these limitations specifically set forth the role played by limitation petitioners in causing the damages. Claimants note:

1. that the dredgers were independent contractors pursuant to contracts with the Corps of Engineers and did not perform the dredging operations under the direction and/or control of the Corps of Engineers and, therefore, are not agents of the Corps;

2. that the burden is on the dredgers to establish the government contractor defense;

3. that the Corps of Engineers does not issue reasonable or precise specifications to limit the limitation petitions and if they did, the Corps did not follow them;[3]

4. that the dredgers failed to warn the Corps of Engineers of the dangers associated with the dredging operations;[4]

5. that the vessels and the dredgers performed advance maintenance and over-depth dredging going beyond its authorized project depth and the over-cut the scope of the channel, based on the potential for undisturbed material to slough downward to the channel, changing the design slope, enlarging the design width of the channel causing wetlands along the banks of the channel to erode and causing the width of the channel to increase (¶ 31 of claim); and

6. that *Yearsley* does not apply because Claimants have alleged that the dredgers are not agents of the defendant as required, but independent contractors;

In addition, Claimants cite several provisions of the contracts between the dredgers and the Corps which they indicate demonstrate that the contractors are not independent contractors for

---

[3] Such pleading appears to the Court to be conclusory in nature.

[4] It appears to the Court that the Corps knew of the dangers of the dredging operations and their effect on the wetlands.

the contractor defense.  With these positions taken into consideration, the Court will now address the merits of the Limitation Dredgers' motion.

**Standard for Rule12(b)(1) and(c)**

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject matter jurisdiction of the district court to hear a case.  The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction.  *Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001).  As the Fifth Circuit has stated:

> When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curium).  This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice.  The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursing a claim in a court that does have jurisdiction.  *Id*.

When a defendant attacks the complaint because it fails to state a legally cognizable claim, Rule 12(b)(6) provides the appropriate challenge.   In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the complaint must be liberally construed in favor of plaintiff,  and all facts pleaded in the original complaint must be taken as true. *Campbell v. Wells Fargo Bank*, *N.A.,* 781 F.2d 440, 442 (5th Cir. 1980). In *Bell Atlantic Corporation v. Twombly*, ___ U.S. ___, ___, 127 S.Ct. 1955, 1969 (2007) the Supreme Court "retired" the  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957), standard for analyzing a  motion to dismiss under Rule 12(b)(6) which held that a district court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Noting that the *Conley* pleading standard "is best forgotten as an incomplete, negative gloss on an accepted pleading standard," the Supreme Court announced that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations of the complaint. *Id.* at ___, ___, 127 S.Ct. at 1969. "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his favor, the complaint states any valid claim for relief." *Lowery v. Texas A&M University System*, 117 F.3d 242, 247 (5th Cir. 1997) quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, §1357, at 601 (1969).

Fed. R. Civ. P. 12(c) provides: "After the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." The standard to apply is the same was that employed under Rule 12(b)(6) construing the plaintiffs' claims in the light most favorable to them and taking the factual allegations contained therein as true." *See Butler v. Nance*, 2001 WL 671745 (N.D. Tex. June 12, 2001) at *2 *citing Mitchell v. McBryde*, 944 F.2d 299, 230 (5th Cir. 1991); *Mann v. v. Adams Realty Co., Inc.,* 556 F.2d 288 (5th Cir. 1977). Thus, the Limitation Dredgers contend that Claimants have not alleged an actionable claim for negligence.

**Analysis**

As stated, Claimants in these proceedings have alleged specific acts of negligence on the part of the Limitation Dredgers which were not alleged in the *Reed/Ackerson* complaints. Claimants have also made allegations which, if accepted as true, could have the effect of rendering the government contractor/*Yearsley* defense an issue more appropriate for summary

10

judgment. In light of these allegations, the Court will focus upon Limitation Dredgers' argument relating to duty and foreseeability.

### Foreseeability and the Group Liability Theory

As the Court noted above, the seminal case defining foreseeability under maritime law is *Consolidated Aluminum Corp. v. C. F. Bean Corp.*, 833 F. 2d 65 (5th Cir. 1987) which provided the following standard:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

*Id.* at 67. Claimants have alleged that the Limitation Dredgers knew or should have known of the dangers of dredging, and further, that the dredgers performed advance maintenance and over-depth dredging going beyond the authorized project depth, and they over-cut the scope of the channel which changed the design slope, enlarged the design width of the channel causing wetlands along the banks of the channel to erode causing the width of the channel to increase.

Here, dredging was conducted by the Corps of Engineers from the time of the completion of MRGO until 1993. After restrictions were imposed in 1993, the Corps dredged MRGO using primarily the DREDGE WHEELER. However, it appears that some contracts were executed for other dredgers to work on MRGO from 1993 through 1999. Then, from 1999 to 2004, the Corps awarded 154 contracts to dredge 352,636,430 cubic yards of dredge material, many of which were awarded to the Limitation Dredgers. (Claims ¶¶ 9-11).

As this Court noted in its opinion concerning the application of §702c immunity to the Corps for its activities on the MRGO:

11

> . . . [I]n the syllabus of a 1988 report, "Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana Reconnaissance Report on Channel Bank Erosion," it states:
>> Since its completion in 1968, the top width of the channel increased from 650 feet to an average of 1,500 feet, in 1987, principally due to erosion. the channel banks have eroded beyond the existing channel right-of-way in several locations.  Much of the bank erosion is caused by wave-wash and drawdown from large displacement vessel traffic on the restrictive waterway.  Passage of these vessels causes very large quantities of water to be displaced from the channel into the adjacent marsh, followed by rapid return flow into the channel.  The tremendous forces exerted by these rapid and extreme water level fluctuations cause the relatively soft marsh adjacent to the channel to break up and be swept into the waterway.  Between 1968 and 1987, bank erosion resulted in the loss of approximately 4,200 acres of highly productive marsh adjacent to the MRGO channel.
>> Continued erosion threatens to produce large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound.  Once the buffering marshes are lost, dredging frequency and quantity in the vicinity of the breach bank are will increase significantly.  The navigation channel will be exposed to storms, currents, and less attenuated tidal action from the north and northeast.  Attendant sedimentation and shoaling problems are expected to occur.  Thus, without corrective action, the bank erosion problem will become a major channel maintenance problem in the future.
>
> (Exhibit 9 at unnumbered page entitled "Syllabus).

*In re Katrina Canal Breaches Consolidated Litigation (Robinson)*, 2008 WL 1989672 (E.D.La. May 2, 2008) at *11.  Furthermore, as the Court stated in the aforementioned *Robinson* opinion:

> In "Issues for Congress" Carter and Stern reported:
>
>> A 1999 Corps report estimated that a total of more than 20,000 acres of coastal wetlands were lost or converted due to construction of the channel and the placement of the spoil materials from its construction.  Since construction, another 3,400 acres of wetlands have been lost due to increased tides and salinity resulting from the MRGO.  Increased salinity also converted some wetlands from less saline to more saline habitats.  For example, in St. Bernard Parish, the MRGO caused 3,350 acres of freshwater/intermediate marshes and 8,000 acres of cypress

> swamps to convert to brackish marshes, and 19,170 acres of brackish marsh and swamp to saline marsh. In addition to wetlands loss and conversion, shallow water habitat also was lost because of the MRGO; 4,800 acres of shallow-open water became deep-open water or disposal areas for dredged materials.

"Issues for Congress" at CRS-4-5.

*Id.* at *4. Thus, a substantial portion of the erosion alleged to have caused Claimants' injuries had occurred prior to 1999.

Limitation Dredgers pointed out during oral argument that none of the allegations against the dredgers indicate which dredger was specifically negligent at which location. Additionally, the Claim and Answer do not state whether the alleged dredging activity took place in 1993, 1998, or 2004, whether it occurred at Mile 60 of the MRGO, Breton Sound or St. Bernard Parish. Moreover, there is no specific allegation as to whether the alleged negligent dredging at a particular location in a particular manner played any role in causing the devastation wreaked by Hurricane Katrina. (Transcript at 5-6).

In *Consolidated Aluminum*, a Texaco pipeline ruptured when a Bean dredging crew failed to follow standard procedures during the dredging operation. As a result, Texaco had to close certain valves which cut off Consolidated Aluminum's supply of natural gas. The sudden termination of natural gas flow caused substantial physical damage to Consolidated's plant, the work in progress and resulted in further economic losses. As stated by the Fifth Circuit:

> The analysis of a maritime tort is guided by general principles of negligence law. *Casaceli v. Martech Int'l., Inc.,* 774 F.2d 1322 (5th Cir.1985); *Daigle v. Point Landing, Inc.,* 616 F.2d 825 (5th Cir.1980). Under those principles a tortfeasor is accountable only to those to whom a duty is owed. *Watz v. Zapata Offshore Co.,* 431 F.2d 100 (5th Cir.1970); 57 Am.Jur.2d *Negligence* § 33 (1971).

13

Determination of the tortfeasor's duty, and its parameters, is a function of the court. Green, *Proximate Cause in Texas Negligence Law,* 28 Tex.L.Rev. 775 (1950). That determination involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party. *Prosser and Keeton on Torts, Duty* § 53 (5th ed. 1984); Green, *The Duty Problem in Negligence Cases,* 28 Col.L.Rev. 1014 (1928); 29 Col.L.Rev. 255 (1929). The foreseeability factor persuaded the trial court. We also find that factor decisive. The critical inquiry is the foreseeability of the injury to Consolidated resulting from Bean's negligent dredging operation. The answer to that question largely defines the duty, if any, owed by Bean to Consolidated.

"Duty ... is measured by the scope of the risk that negligent conduct foreseeably entails." Harper, James & Gray, *The Law of Torts, Scope of Duty in Negligence Cases* § 18.2 at 655 (2d ed. 1986). The duty "may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct, and not to other interests even of the same plaintiff which may in fact happen to be injured." Id. at 660 (interpreting dicta in *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 347, 162 N.E. 99, 101 (1928)). For, as the eminent commentator and scholar Wex S. Malone observed in his Ruminations on Cause-in-Fact, collected in his *Essays on Torts,* p. 172 (1985), first published 9 Stan.L.Rev. 60 (1956):

All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect *some* persons under *some* circumstances against *some* risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises (emphasis in original).

Foreseeability obviously marks the limits placed on a defendant's duty; the precise meaning of the concept is vital. As negligence law developed in England the concept became "whether any ordinarily prudent man would have foreseen that damage would probably result from his act." F. James & R. Perry, *Legal Cause,* 60 Yale L.J. 761, 786 (1951) ( *quoting* 8 W. Holdsworth, *A History of English Law* 450 (2d ed. 1937)). Modern courts have given the concept varying meanings. One scholar assigned an almost generic definition, "the anticipation of harm of a *general sort* to persons of a *general class.*" Harper, *The Foreseeability Factor in the Law of Torts,* 7 N.D.Law. 468, 482 (1932) (emphasis in original).

Foreseeability guided our decision in *Republic of France v. United States,* 290 F.2d 395 (5th Cir.1961) in which a fire in the ship's cargo of fertilizer grade ammonium nitrate was followed by an explosion. The explosion was unprecedented; there was no general knowledge of the explosive nature of nitrate when exposed to fire. Although the vessel owners were negligent in handling the fire, we exonerated them from liability for the injuries caused by the explosion, concluding that because of the unknown volatility of the cargo, the shipowners

14

> reasonably could not have foreseen that explosion. We held that to be found liable a defendant must have "knowledge of a danger, not merely possible but probable ..." 290 F.2d at 401 ( *quoting Dalehite v. United States,* 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953) (citations omitted)).
>
>> Other commentators muse that "foreseeability ... includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct." Harper, James & Gray, *The Law of Torts, Scope of Duty in Negligence Cases* § 18.2 at 657-59 (2d ed. 1986).
>
>> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

*Consolidated Aluminum*, 833 F.2d at 67-68. Applying the above analysis, the appellate court held that Bean could not have anticipated that its failure to follow safe dredging procedures would likely to result in the damage sustained by Consolidated Aluminum.

In *Lloyds Leasing Ltd. v. Conoco*, 868 F.2d 1447 (5th Cir. 1989), the court again applied the foreseeability test in a maritime context. In that case, an oil spill occurred as a result of the grounding of a tanker. The oil washed ashore on Galveston Island, approximately 70 miles west of the site of the grounding. There were several categories of claims; however, the appellants in *Lloyds* were the claimants who suffered damages from oil tracked upon their premises by tourists and beach goers. Applying the *Consolidated Aluminum* foreseeability test, the Fifth Circuit affirmed the lower court's finding that the harm suffered by the plaintiffs was not foreseeable and therefore dismissal was proper.

The *Consolidated Aluminum* test was also used by Judge Sarah Vance in *Gisclair v. Galliano Marine Serv., et al.* 484 F. Supp.2d 518 (E.D. La. 2007). In *Gisclair*, a freezer aboard a vessel malfunctioned, and one of the defendants was unsuccessful in attempting to fix it. As a result, the freezer began to fail, and the items in the freezer had to be transferred to another vessel.

15

In the course of that transfer, Gisclair injured his back. The court held that Gisclair's injury was too attenuated applying the *Consolidated Aluminum* standard.

Limitation Dredgers also urge that the Claim and Answer fail because they are based upon a group liability theory. The case of *Barasich v. Columbia Gas Transmission Co.*, 467 F. Supp. 2d 676 (E.D.La. 2006) (Vance, J.) illuminates this issue. Although *Barasich* applies Louisiana the duty-risk formula, it is analogous in this maritime setting. In this case, plaintiffs filed class actions alleging that activities of oil and gas producing companies and oil and gas pipeline companies contributed significantly to the impact of Hurricanes Katrina and Rita because the defendants' activities allegedly caused substantial damage to Louisiana's wetlands, thereby weakening the protective barrier against storm surge caused by these hurricanes.

The Court relied on *Consolidated Aluminum* in discussing duty, and found that there was no duty on the part of the defendants. Additionally, the court in discussing causation noted that the plaintiffs alleged that all of the defendants activities caused all of the plaintiffs' damages. The court noted that the defendants conduct took place in different areas, at different times, over the course of many years. The court characterized plaintiffs' theory as some form of group liability. The court held that plaintiffs cannot impose liability on a defendant absent a showing of individual causation citing *In re Fibreboard Corp.*, 893 F.2d 706, 710-11 (5th Cir. 1990) (rejecting proposed trial procedure that would impose group liability without individual determinations as to causation). The Court also cited *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 316 (5th Cir. 1998) (finding group determination of liability inappropriate when injuries took place "at widely different times and places). The court cited a number of other cases rejecting a group liability theory.

Here, even if discovery were permitted, it is clear that the Government dredged exclusively for decades. Then for approximately a six year period, both the Government and some of the dredgers performed dredging along the MRGO at different locations at different times. It is also clear that when the Limitation Dredgers began to dredge the MRGO exclusively in 1999, a great amount of damage to the wetlands had taken place. Also, again, these dredgers dredged at different places at different times. Clearly, the Claimants are not alleging only one defendant caused the alleged harm and it seems inexorable that in order to find liability, there would have to be some group liability finding in reference to causation. Claimants have cited no case in the maritime law context where a group liability theory has been recognized or applied. As such, it would be virtually impossible to apportion negligence among the parties involved.

Claimants in post-hearing briefing argue that one of the dredgers, Great Lakes Dredge and Dock Co., ("Great Lakes") filed documents with the Securities and Exchange Commission ("SEC") on March 29, 2000, covering the period ending December 31, 1999, which demonstrate that Great Lakes was subject to certain environmental laws and regulations and that the damages from dredging were in fact foreseeable. The Court regards these statements as rather standard SEC filings. Furthermore, the statements therein do not persuade the Court that dredger claimants had a duty with respect to the damages alleged herein with respect to Hurricane Katrina. The acknowledgment by Great Lakes that "its business is subject to significant operating risks and hazards that could result in damage or destruction to persons or property" and that such risks include "flooding" are general statements that certainly does not indicate that Great Lakes could foresee the catastrophic damages alleged here under the test set forth in *Consolidated Aluminum*.

In addition, Claimants argue that the Court found a duty in *In re Katrina Canal Breaches Consolidated Litigation, (Levee/MRGO)*, 2007 WL 4219351 (E.D. La. November 27, 2007) with respect to the Washington Group International and the work they performed at the Industrial Canal site; therefore, a concomitant duty should be found here.  The allegations against the Washington Group involve specific acts at a specific place at a specific time by one defendant. Moreover, there were allegations to the effect that the Washington Group knew or should have known that it had damaged the levee/floodwall structures and did nothing to correct the problem. Those facts as alleged are vastly less attenuated from the damages alleged than the allegations before the Court here.  Obviously, the allegations are that WGI performed works that allegedly directly damaged the levee/floodwall that protected the plaintiffs seeking damages there.  There is no such allegation of distinct damage to a specific structure designed to prevent flooding in the Claim or Answer filed in these limitation proceedings.

In sum,  the Claimants pleadings do not differentiate among the dredgers, do not state where the dredging activities took place, do not state whether all or part of the dredging activities conducted by the Limitation Dredgers were negligent, and make sweeping, conclusory allegations reference causation.  *Consolidated Aluminum, Lloyds, Gisclair,* and *Barasich* all found no duty based on foreseeability due to the attenuated nature of the harm.  MRGO had widened substantially and the wetlands had been severely damaged prior to any activity by the Limitation Dredgers.  It is simply inconceivable to this Court why discrete acts of dredging after 1993 by the myriad dredgers would be sufficient for the specific dredger to foresee the absolutely devastating and cataclysmic damages that occurred to St. Bernard and Orleans Parishes.  Simply put, the Limitation Dredgers could not have anticipated that its alleged negligent dredging would be a

18

cause thereof. Discovery might show where each limitation dredger performed its respective work and the manner in which it was performed; however, this would not overcome the issue of foreseeability.

Additionally, Claimants' pleadings ineluctably are dependent upon a group liability theory which is simply not recognized under the law. The pleadings demonstrate that it would be virtually impossible that the act of one dredger sometime after 1993 was a cause of the damages. At the very best, plaintiffs would have to show that the cumulative action of all of the dredgers was a cause. Moreover, Claimants do not assert a causal connection linking a particular defendant's operations to a particular plaintiff's injury. To recover on this theory would obviate proof of individual causation and is therefore fatally flawed. Accordingly,

**IT IS ORDERED** that The Limitation Dredgers' Motion to Dismiss Pursuant to 12(b)(1) and 12(c) (Doc. 128) filed by Great Lakes Dredge & Dock Company L.L.C., Mike Hooks, Inc., T.L. James & Company, Inc. TLJIC, L.L.C., Manson Construction Co., Luhr Bros. Inc., King Fisher Marine Service, L.P., Pine Bluff Sand & Gravel Company, Weeks Marine, Inc. and Gulf Coast Trailing Company is **GRANTED**.

**IT IS FURTHER ORDERED** that Limitation Defendants shall present to the Court the appropriate motion to dispose of the "protective claims and cross-claims filed by the Limitation Dredgers and the Bean Entities" found at Rec. Docs. Nos. 38, 45, 46, 48, 52, 56, 60, 66, 67, 73-75, and 78 which the Limitation Dredgers and the Bean Entities apparently agree become moot with the granting of this motion, as well as the Third-Party Complaint (Doc. 112) so that judgment can be entered forthwith.

New Orleans, Louisiana, this  12th  of June, 2008.

*[signature]*

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**